IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–00904–EWN–BNB

DOUGLAS L. PINTAR,

    Plaintiff,

v.

LIBERTY LIFE ASSURANCE COMPANY, a foreign corporation,

    Defendant.

---

**ORDER AND MEMORANDUM OF DECISION**

---

This is an Employee Income Retirement Security Act ("ERISA") case. Plaintiff Douglas Pintar alleges that Defendant Liberty Life Assurance Company improperly denied him disability benefits in violation of 29 U.S.C. § 1132(a)(1)(B) (2004). This matter is before the court on (1) "Plaintiff's Revised Motion for Partial Summary Judgment: Burden of Proof, Standard of Review, Admission of Additional Evidence and Scope of Discovery," filed September 8, 2004, (2) "Defendant's Objection to Magistrate Judge's Discovery Order of October 19, 2004," filed October 29, 2004, (3) "Defendant's Objection to Magistrate's Discovery Order of November 15, 2004," filed November 24, 2004, and (4) "Defendant's Cross Motion for Determination," filed January 18, 2005. Jurisdiction is based on 29 U.S.C. § 1132 and 28 U.S.C. § 1331 (2004).

**ANALYSIS**

*1.    Factual Background*

Defendant is the ERISA plan administrator and insurer of Minolta-QMS, Inc. ("QMS"). (Admin. R. at 1–32.)[1] Plaintiff worked for QMS as a computer software engineer from June 12, 2000 until July 2, 2001. (*Id.* at 373.) His job was to develop and implement software and algorithms related to color matching, separations, calibration, halftoning, and resolution enhancement techniques for QMS' color laser printers. (*Id.* at 203.) In his job, Plaintiff needed to be able to sit for eight hours per day and lift ten pounds or less ten times per day. (*Id.* at 202.)

As an employee of QMS, Plaintiff was eligible to receive disability income benefits in accordance with the terms and conditions of Defendant's Group Disability Income Policy ("policy") with QMS. (Def.'s Cross Mot. for Determination at 4 [filed Jan. 18, 2005] [hereinafter "Def.'s Br."]; Pl.'s Resp. to Def.'s Cross Mot. for Determination at 1 [filed Feb. 16, 2005] [hereinafter "Pl.'s Resp."].) Under the policy, a person is disabled from his or her own occupation if the person is "unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness." (Admin. R. at 55.) The policy also vests Defendant with discretionary authority "to construe the terms of this policy and to determine benefit eligibility." (*Id.* at 25.) The policy further states that "[p]roof of continued [d]isability or [p]artial [d]isability, when applicable, and regular attendance of a

---

[1]Neither party filed the administrative record in this case with the court. Nevertheless, the parties concur that a true and correct copy of the administrative record is attached to Defendant's cross motion for determination. In this Order and Memorandum of Decision, I refer to this administrative record provided by Defendant.

[p]hysician must be given to [Defendant] within 30 days of the request for the proof," and that Defendant, "at its own expense, will have the right and opportunity to have [an insured], whose [i]njury or [s]ickness is the basis of a claim, examined by a [p]hysician or vocational expert of its choice." (*Id.* at 27.)[2]

On February 11, 2000, Plaintiff was injured when a "speaker cabinet" fell on his foot at a party. (*Id.* at 374.) Plaintiff first visited John Jachimiak, M.D., regarding his foot injury on March 8, 2001. (*Id.* at 371.) On April 27, 2001, Dr. Jachimiak performed hallux limitus correction surgery on Plaintiff's left foot. (*Id.* at 359–60, 371.) Plaintiff stopped working at QMS on July 2, 2001, and starting on July 6, 2001, Dr. Jachimiak put Plaintiff on Vicoprofen. (*Id.* at 358, 373.)[3] In July 2001, Plaintiff applied for disability benefits from Defendant. (*Id.* at 371, 374.)

In mid-October 2001, Dr. Jachimiak opined that Plaintiff could return to work on a modified duty position on November 15, 2001, and a regular duty position on December 1, 2001. (*Id.* at 339.) Around the same time, Dr. Jachimiak stated that

> [i]t is my guess . . . that we're probably still a month away before he's going to be able to put weight on this thing and start to return to work. We refilled the Vicoprofen for him at this time and I do not see how he can go back to work until he's off the narcotics.

(*Id.* at 340.)

---

[2]Other than the foregoing, neither party has identified language in the policy regarding the extent to which the insured is required to provide medical records and the extent to which, if any, Defendant may independently investigate claims.

[3]Vicoprofen is a narcotic pain medication. *See* Medline Plus, U.S. National Library of Medicine and National Institutes of Health, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/203600.html.

On November 15, 2001, Defendant approved Plaintiff for long term disability benefits effective July 3, 2001 with payments beginning on October 1, 2001. (*Id.* at 285–287.) On November 27, 2001, Dr. Jachimiak stated that Plaintiff could return to work on December 24, 2001. (*Id.* at 235–36.)

While Plaintiff was recovering from his foot problem, he sustained a partial tear of his left rotator cuff and underwent surgery to repair his rotator cuff on December 21, 2001. (*Id.* at 252.) Drigan D. Wieder, M.D., the physician who performed this surgery, opined in Defendant's medical restrictions form that Plaintiff could not engage in lifting, pushing, or pulling for twelve weeks after the surgery. (*Id.* at 249.) On February 13, 2002, Dr. Jachimiak completed a medical restrictions form for Defendant that stated that Plaintiff did not have any limitations or restrictions from December 24, 2001 to January 22, 2002. (*Id.* at 238.)

On February 22, 2002, Defendant received a completed medical restrictions form from Gerald Rupp, M.D., who opined that Plaintiff would be having surgery for his carpal tunnel syndrome and that after surgery Plaintiff could not use his right arm for four weeks and should limit his right arm to light activity from weeks four to eight after surgery. (*Id.* at 210.)

On March 11, 2002, in a questionnaire from Defendant, Plaintiff wrote that he had been experiencing memory/concentration problems and that "pain drugs make me sluggish[;] it takes forever to get through a novel, whereas I normally read 2–3 per week." (*Id.* at 199.)

On May 10, 2002, James G. Reid, M.D., performed surgery on Plaintiff to treat his carpal tunnel syndrome. (*Id.* at 133–35.) In a follow up visit on May 20, 2002, Dr. Reid noted that Plaintiff "is doing well. . . [and] is actually quite high functioning." (*Id.* at 132.) Dr. Reid

-4-

explained that he "refilled [Plaintiff's] prescription for Vicoprofen," and that he asked Plaintiff "to avoid heavy lifting, pulling, pushing, or grabbing activities for the next month." (*Id.*)

During May and June 2002, Plaintiff saw Dr. Jachimiak on three occasions regarding pain. (*Id.* at 120–22.) In a visit on June 7, 2002, Dr. Jachimiak stated that he refilled Plaintiff's Vicoprofen prescription and that Plaintiff "will be scheduled for chronic pain management." (*Id.* at 120.)

In a letter dated July 9, 2002, Defendant informed Plaintiff that it was discontinuing benefits effective July 12, 2002 since it had determined that Plaintiff was no longer disabled from his own occupation. (*Id.* at 58–60.) In this letter, Defendant explained that Plaintiff had sixty days to request a review of Defendant's decision, and this request should be in writing and "include documentation such as test results or any medical information which you feel will support your claim." (*Id.* at 59.)

Dr. Jachimiak once again prescribed Vicoprofen for Plaintiff on July 15, 2002. (*Id.* at 120.) According to an exhibit presented by Plaintiff that is not contained in the administrative record, David R. Simons, M.D., on July 18, 2002, noted that he and Plaintiff discussed pain management and that Plaintiff was "groggy with Tempazepam." (Pl.'s Resp., Ex. D [Progress Notes].)

On July 19, 2002, Plaintiff wrote to Defendant to appeal Defendant's July 9, 2002 denial. (Admin. R. at 110–11.) In this letter, Plaintiff wrote that

> the physical requirements of my occupation include the ability to develop software. The ongoing pain medications I'm taking affect my ability to concentrate and remember details, making it impossible for me to perform such development. I still suffer from constant pain in both my left foot, which has been under treatment

> by Dr. Jachimiak, and my Cervical spine, which has been being [sic] treated by Dr. Simons. I have been taking narcotic pain medication for these conditions. . . . I am clearly currently unable to perform my job duties. Please be aware that, unless a non-narcotic solution to managing my pain can be found, this condition may persist for some time to come.

(*Id.*) Plaintiff did not attach any medical records to this appeal in support of his statements. (*Id.*) Defendant referred this appeal to David Dickison, D.O., on September 3, 2002, for his review. (*Id.* at 97–102.) Neither Defendant nor Dr. Dickison requested or reviewed any medical documentation after July 15, 2002 from Plaintiff or his physicians. (Pl.'s Resp. at 6; Def.'s Reply in Supp. of Cross Mot. for Determination at 5 [filed Mar. 2, 2005].) On September 12, 2002, Dr. Dickison reported to Defendant that Plaintiff was not impaired in sedentary or light activities. (Admin. R. at 98.) While Dr. Dickison did mention Plaintiff's reports of pain, he did not discuss the possibility that Plaintiff's use of narcotic pain medication may have been decreasing his mental functioning capacity. (*Id.* at 98–99.)

According to an exhibit presented by Plaintiff that is not contained in the administrative record, Dr. Simons, on September 19, 2002, stated that Plaintiff "notes decreased mental function since being on medications for pain on a chronic basis." (Pl.'s Resp., Ex. F [9/19/02 Notes].) The next day, September 20, 2002, Defendant affirmed its earlier decision denying Plaintiff benefits. (Admin. R. at 92–94.) In its denial, Defendant explained, *inter alia*, that "[t]here is documentation of prescriptions being written for [narcotic pain] medications; however, there is no documentation that you are reporting problems to your physicians or that they are causing you problems or preventing a return to work in your occupation." (*Id.* at 93.)

Plaintiff presents two additional pieces of evidence not contained in the administrative record, which deal with his medical history after Defendant's denial of his appeal. On October 9, 2002, Dr. Jachimiak stated that Plaintiff's "use of narcotics is preventing him from mentally being able to perform his regular duties. Until these lower extremity issues are cleared up, it would seem that he is disabled from his regular job." (Pl.'s Resp., Ex. H [Letter from Jachimiak to Makkai on 12/2/02].) On January 20, 2003, Dr. Simons opined that Plaintiff's

> [l]ack of sleep and poor pain control and a need for opiate class medication all make it difficult for him to concentrate and perform the functions of a programmer. He is unable to retain details sufficient to perform programming. . . . At the present time [Plaintiff] is totally disabled from working as a programmer.

(*Id.*, Ex. I [Letter from Simons to Makkai on 1/20/03].)

### 2. *Procedural History*

Plaintiff filed his complaint in this court on May 3, 2004. (Pl.'s Compl. for Declaratory Relief and Damages and Jury Demand [filed May 3, 2004].) On July 23, 2004, Plaintiff filed a motion for partial summary judgment. (Pl.'s Mot. for Partial Summ. J.: Burden of Proof, Standard of Review, Admis. of Additional Evidence and Scope of Disc. [filed July 23, 2004].) In light of the Tenth Circuit's decision in *Fought v. Unum Life Insurance Co. of America*, discussed below, Plaintiff filed a revised motion for partial summary judgment on September 8, 2004. (Pl.'s Revised Mot. for Partial Summ. J.: Burden of Proof, Standard of Review, Admis. of Additional Evidence and Scope of Disc. [filed Sept. 8, 2004].)

On October 19, 2004, the magistrate judge denied Defendant's amended motion to strike Plaintiff's disclosure of expert witness testimony. (Order [filed Oct. 19, 2004].) Defendant filed an objection to this order on October 29, 2004. (Def.'s Objection to Magistrate Judge's Disc.

Order of October 19, 2004 [filed Oct. 29, 2004].) On November 15, 2004, the magistrate judge granted Plaintiff's motion for discovery outside of the administrative record. (Courtroom Mins. [dated Nov. 15, 2004].) Defendant filed an objection to this order on November 24, 2004. (Def.'s Objection to Magistrate's Dis. Order of November 15, 2004 [filed Nov. 24, 2004].)[4] On January 18, 2005, Defendant filed a cross motion for determination. (Def.'s Br.) All pending motions are fully briefed.

## ANALYSIS

### *1.* *Standard of Review*

Plaintiff moves for summary judgment under Rule 56. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325). The nonmoving party may not rest solely on the

---

[4] I need not address the specifics of these objections and the underlying order by the magistrate judge because these issues are moot in light of my conclusions in this Order and Memorandum of Decision.

allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.'" *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir. 1990]).

It is not entirely clear that a motion for summary judgment is the proper vehicle for the court to use in a 29 U.S.C. § 1132 case. Indeed, Defendant did not file a motion for summary judgment but rather filed a brief styled "Defendant's Cross Motion for Determination." (Def.'s Br.) In *Olenhouse v. Commodity Credit Corp.*, the Tenth Circuit held that a district court's judicial review of an agency action should follow appellate rules of procedure as opposed to the federal rules of civil procedure. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579–80 (10th Cir. 1994). Several courts have held that *Olenhouse*'s rule applies to a review of an administrator's denial of disability benefits in ERISA cases. *Caldwell v. Life Ins. Co. of N. Am.*, 37 F. Supp. 2d 1254, 1257 (D. Kan. 1998), *rev'd in part on other grounds*, 287 F.3d 1276 (10th Cir. 2002); *Brooks v. Guardian Life Ins. Co. of Am.*, 995 F. Supp. 1174, 1177 (D. Kan. 1998); *Clausen v. Standard Ins. Co.*, 961 F. Supp. 1446, 1455 (D. Colo. 1997). However, summary judgment seems to be the standard of review most courts apply in ERISA cases, and the Tenth Circuit has repeatedly, but without explanation, followed the summary judgment approach in

such cases. *E.g., Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1002 (10th Cir. 2004) (applying usual *de novo* appellate review of district court's order on summary judgment in an ERISA case); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999) (same). I need not determine whether to apply the summary judgment standard of review or an appellate standard of review because under either standard, I reach the same conclusion. Moreover, the parties' respective filings have raised all issues necessary to resolve this case under either procedural device.

Courts should apply a *de novo* standard of review regarding a plan administrator's denial of benefits unless the benefit plan gives the administrator of the plan discretionary authority to determine an employee's eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Fought*, 379 F.3d at 1002–03. Here, the policy gives Defendant discretionary authority "to construe the terms of this policy and to determine benefit eligibility." (Admin. R. at 25.) Where the plan grants the plan administrator discretionary authority, courts review the plan administrator's decision under an arbitrary and capricious standard. *Fought*, 379 F.3d at 1003. Such a review is generally limited to the administrative record. *Id.*; *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 823–24 (10th Cir. 1996); *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992).

The burden under the arbitrary and capricious standard depends upon whether the plan administrator operates under a conflict of interest. In ERISA denial of benefits cases, the plaintiff is required to prove the existence of a conflict of interest. *Fought*, 379 F.3d at 1005. The parties agree that Defendant has an inherent conflict of interest. (*See* Def.'s Br. at 14; Pl.'s Resp. at 11.) In such circumstances,

> the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard. In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence.

*Fought*, 379 F.3d at 1006 (citation omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]. Substantial evidence requires more than a scintilla but less than a preponderance." *Sandoval*, 967 F.2d at 382 (quoting *Flint v. Sullivan*, 951 F.2d 264, 266 [10th Cir. 1991]) (internal quotation marks omitted) (alteration in original).

## 2.  *Legal Analysis*

As set forth below, I can resolve this case in light of the parties' briefings in Defendant's cross motion for determination. A recent Tenth Circuit case controls the result in this case. In *Gaither v. Aetna Life Insurance Co.*, 388 F.3d 759 (10th Cir. 2004), the insured plaintiff was suspended from his job for his use of narcotic pain medication, which his employer determined rendered him unfit to work at his job. *Gaither*, 388 F.3d at 761–65. The defendant ERISA insurer, however, denied disability benefits on the basis that the underlying conditions that caused the insured to need disability benefits did not render him disabled. *Id.* at 765–66. Although the insured raised the issue of his narcotic drug use, the insurer did not address this issue. *Id.* at 766. The insurer was unaware that the insured had been suspended from his job for his use of narcotic pain medication. *Id.* at 761, 766.

The Tenth Circuit began its analysis by noting that while the administrative record did not contain the information that the insured had been suspended from his job for use of narcotic

-11-

pain medication, the administrative record did discuss the insured's previous use of pain medication and that being drug-free was an essential requirement of his job. *Id.* at 768–70. Based upon this review of the administrative record, the *Gaither* court explained that

> while the administrative record may not have contained conclusive proof of ongoing narcotic drug use, [the insurer] had more than enough evidence to alert it to the possibility that during the relevant time period, [the insured] was using narcotic pain medication; that he had a medical justification for doing so . . . ; and that any such drug use rendered him unfit for his job . . .

*Id.* at 770. The *Gaither* court found that

> Given the indications in the record of a drug problem . . . it was arbitrary and capricious for [the insurer] to dismiss [the insured's] claim for disability without at least attempting to obtain information from [the employer] about the reasons for [the insured]'s leave of absence. . . . [W]hile [the insurer]'s physicians had substantial evidence supporting their conclusion that [the insured] was not psychologically disabled, they did not have substantial evidence about the extent or effects of his uncontroverted use of painkillers, another independent ground for disability presented in the record and specifically raised in [the insured]'s administrative appeal.

*Id.* at 773. In response to the insurer's argument that this case would result in insurers having to engage in an extensive search for information not provided by the insured, the Tenth Circuit explained that "we assert the narrow principle that *fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory.*" *Id.* at 773 (emphasis added).

Here, Defendant was put on notice that Plaintiff's reason for requesting continued disability benefits was his use of narcotic pain medication, and Plaintiff did not believe that he

could mentally perform his job on such medication. (Admin. R. at 110–11.) Moreover, the administrative record provides at least two pieces of evidence that Plaintiff could not work at his own occupation while on narcotic pain medication. First, on March 11, 2002, in a questionnaire by Defendant, Plaintiff wrote that he had been experiencing memory/concentration problems and that "pain drugs make me sluggish[;] it takes forever to get through a novel, whereas I normally read 2–3 per week." (*Id.* at 199.) Second, and more important, in October 2001, Dr. Jachimiak opined that "I do not see how [Plaintiff] can go back to work until he's off the narcotics." (*Id.* at 340.) The record is also clear that Plaintiff was on narcotic pain medication during the pertinent time frame, and that Plaintiff repeatedly saw doctors regarding his problems with pain. (*Id.* at 93, 120–22, 132, 358.)

In light of this "evidence in the record [that] suggests that [further] information might confirm the beneficiary's theory of entitlement," Defendant "cannot shut [its] eyes to [this] readily available information." *Gaither*, 388 F.3d at 773. Indeed, had Defendant simply contacted Plaintiff's treating physicians in order to ask them whether Plaintiff's usage of narcotic pain medication caused Plaintiff to be disabled, they would have related that Plaintiff's usage of pain medication was, in their opinion, disabling. (*See* Pl.'s Resp., Ex. D [Progress Notes], Ex. F [9/19/02 Notes], Ex. H [Letter from Jachimiak to Makkai on 12/2/02], Ex. I [Letter from Simons to Makkai on 1/20/03].)[5]

---

[5]In light of *Gaither*'s examination of facts beyond the administrative record to determine if the insured shut its eyes to readily available information, I consider these facts beyond the administrative record to the extent that it demonstrates that information was readily available regarding Plaintiff's putative mental disability based upon use of narcotic pain medication.

In spite of the foregoing, Defendant contends that this rule only applies if there is "little or no evidence in the record to refute" Plaintiff's claim of disability, *Gaither*, 388 F.3d at 773, and here there is substantial evidence that refutes Plaintiff's claim of disability. (Def.'s Br. at 25–26.) The problem with Defendant's argument is that a review of the administrative record does not reveal substantial evidence that refutes Plaintiff's claim of a *mental* disability due to use of narcotic pain medication.

Defendant points to Dr. Reid's statements about Plaintiff's high level of functioning to support its argument that Plaintiff was not disabled, but these statements do not indicate that Plaintiff had the mental capacity to return to work while on narcotic pain medication. (Admin R. at 132.) Likewise, Drs. Wieder and Rupp's respective medical opinions regarding Plaintiff's limitations dealt with his physical limitations owing to surgery, not his mental limitations owing to pain. (*Id.* at 210, 249.) Thus, these opinions are not relevant to whether Plaintiff's use of narcotic pain medication was disabling. *See Gaither*, 388 F.3d at 773 ("while [the insurer]'s physicians had substantial evidence supporting their conclusion that [the insured] was not psychologically disabled, they did not have substantial evidence about the extent or effects of his uncontroverted use of painkillers, another independent ground for disability presented in the record and specifically raised in [the insured]'s administrative appeal.").

Dr. Jachimiak's statements regarding Plaintiff's ability to return to work provide greater support for Defendant's argument, but are still insufficient to show that Defendant could avoid inquiry into the impact of Plaintiff's usage of narcotic pain medication on Plaintiff's mental functioning. In mid-October 2001, Dr. Jachimiak stated that Plaintiff could return to work on a modified duty position on November 15, 2001 and a regular duty position on December 1, 2001.

(Admin. R. at 339.) This statement is contradicted, however, by Dr. Jachimiak's statement at the same time that "I do not see how [Plaintiff] can go back to work until he's off the narcotics." (*Id.* at 340.) Reading these two statements together, the logical conclusion is either that (1) Dr. Jachimiak incorrectly assumed that Plaintiff would be off the narcotic pain medication by November 15, 2001, or (2) Dr. Jachimiak's statement that Plaintiff could return to work dealt with his physical ability to work, not his mental capacity to perform his work. A month later, Dr. Jachimiak pushed back Plaintiff's return to work date to December 24, 2001. (*Id.* at 235–36.) In February 2002, Dr. Jachimiak stated that Plaintiff did not have any occupational limitations or restrictions from December 24, 2001 to January 22, 2002. (*Id.* at 238.) Of course, this statement refers to Plaintiff's foot problems, and Plaintiff was physically disabled due to his rotator cuff injury from late December 2001 to March 2001. (*Id.* at 249.) Dr. Jachimiak's statements do not deal with Plaintiff's use of narcotic pain medication in the spring of 2001 and thereafter, and thus do not provide substantial evidence to support Defendant's position. While Dr. Jachimiak's February 2002 statement provides a scintilla of evidence in support of Defendant's position, it is insufficient to permit Defendant to "shut [its] eyes to readily available information" it could have requested and obtained from Plaintiff and his treating physicians regarding the effects of Plaintiff's use of narcotic pain medication on his mental ability to work. *See Gaither*, 388 F.3d at 773.

In light of the foregoing, Defendant's decision to deny Plaintiff long term disability benefits without obtaining further information regarding the effects of Plaintiff's use of narcotic pain medication (on his mental capacity to perform his own occupation) was arbitrary and capricious. Under *Gaither*, it is appropriate to remand the case to Defendant to reconsider its

decision. *Id.* at 776 (explaining that "[o]n remand, [the insurer] is required to reconsider its decision in light of the entire record, and to request and obtain additional documentation if necessary to determine [the insured]'s eligibility for disability benefits.") Accordingly, I remand this case to Defendant for further action consistent with this Order and Memorandum of Decision.

### 3. *Conclusions*

Based on the foregoing it is therefore

ORDERED as follows:

1. Plaintiff's revised motion for partial summary judgment (# 23) is GRANTED.

2. Defendant's objection to the magistrate judge's order of October 19, 2004 (# 40) is DENIED as moot.

3. Defendant's objection to the magistrate judge's order of November 15, 2004 (# 50) is DENIED as moot.

4. Defendant's Cross Motion for Determination (# 56) is DENIED.

5. This case is REMANDED to Defendant for additional proceedings consistent with this opinion, and the clerk will close the case in this court.

Dated this  4th  day of August, 2005.

BY THE COURT:

s/Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge